IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

M. KATHLEEN MCKINNEY, Regional
Director of Region 15 of the National
Labor Relations Board and on behalf
of the NATIONAL LABOR RELATIONS
BOARD                                                                              PETITIONER


V.                                        CIVIL NO. 4:14-cv-4037


SOUTHERN BAKERIES, LLC                                                    DEFENDANT


## MEMORANDUM OPINION

Before the Court is Petition for 10(j) Injunctive Relief filed by M. Kathleen McKinney

("McKinney"), the Regional Director of Region 15 of the National Labor Relations Board.  (ECF

No. 1).  Defendant Southern Bakeries, LLC ("Southern Bakeries") has responded.  (ECF No.

20).  McKinney has replied.  (ECF No. 23)   Defendant Southern Bakeries has filed a sur-reply.

(ECF No. 29).  The Court finds the matter ripe for consideration.[1]

## BACKGROUND

Southern Bakeries is a commercial bakery facility in Hope, Arkansas.  In 2005, Southern

Bakeries purchased the plant from Myer's Bakeries, Inc.  Southern Bakeries hired a majority of

the former Meyer's Bakeries employees and recognized the Bakery, Confectionary, Tobacco

Workers and Grain Millers International Union, Local 111 ("the Union") as the collective

---

[1]McKinney filed a Motion to Try Section 10(j) Injunction Petition on the Basis of the Administrative Record.  (ECF No. 6).  Southern Bakeries did not respond to the motion.  Upon consideration, the Court finds that the motion should be and hereby is **GRANTED**. The Court will review McKinney's 10(j) petition based on the administrative record.

bargaining agent for its production and sanitation employees.   The parties memorialized this relationship in several contracts, with the most recent agreement running from February 8, 2010, to February 8, 2012. The international union representative, Cesar Calderon, serviced the bargaining unit.  In servicing the bargaining unit, Calderon handled grievances and bargaining.

On December 7, 2011, a Southern Bakeries employee filed a decertification petition with the National Labor Relations Board ("the Board") seeking to oust the Union.  In response to the petition, the Union filed allegations of unfair labor charges against Southern Bakeries with the Board and blocked the decertification election sought by the employees.

After the employee filed the petition, the Union increased visits to Southern Bakeries. The Collective Bargaining Agreement between Southern Bakeries and the Union addressed the Union's access to Southern Bakeries's facility.   Specifically, the Collective Bargaining Agreement provided that:

> [Southern Bakeries] agrees that a duly authorized representative of the Union shall be granted permission to enter the production and sanitation departments for the purpose of seeing that the Agreement is being observed after giving the company preferably twelve (12) hours actual notice to the most senior [m]anagement [o]fficial, [p]lant [m]anager, and/or [h]uman [r]esources [m]anager of their intent to visit the facility. The Company in its sole discretion may accept a reduced notice period in the event of an urgent or emergency situation. The visit will be subject to the Union representative being accompanied by a [c]ompany [r]epresentative, except between designated employee break areas on the most direct route and provided that there will be no interference with the employee[s'] working time. Any entry to the [p]roduction and/or [s]anitation [d]epartments must be preapproved by the [p]lant [m]anager and a [c]ompany [r]epresentative must accompany the Union representative beyond the employee break area[s]. The Union [r]epresentative agrees to limit the break room visitation to a Company designated break room area. The Union [r]epresentative must comply with all of the Company's standard rules and regulations, including the Companies [n]on-disclosure Policy, which will require the Union [r]epresentative to sign a [n]on-[d]isclosure [a]greement.

Calderon testified that before the first decertification petition, the Union freely met with the employees in the break area.  He testified that Southern Bakeries only asked for advance notice of the visits and did not monitor the subject matter or frequency of the visits.  Rick Ledbetter, the Company's executive vice president and general manager, also testified that Southern Bakeries enjoyed a "level of trust" with the Union.  However, after employee filed the first decertification petition, Calderon testified that the circumstances surrounding the Union's visits changed.

For example, on March 20, 2012, Calderon stated that when he arrived at Southern Bakeries to visit with employees, Dan Banks ("Banks"), the Director of Manufacturing, met him and escorted him to the vending machine area in the break room.  A small cubicle had been set up for Calderon to meet with employees within the break room.  Calderon testified that Banks told him that employee complaints resulted in the implementation of a new procedure for meetings with employees.  Banks told Calderon that he needed to identify who he wanted to meet and Banks would retrieve those employees for Calderon.  Calderon refused to abide by this new procedure and insisted that Banks allow him to meet with employees freely.  Banks denied him that access and threatened to call the police.  Calderon left the facility after only a short meeting.  After leaving the facility, Calderon learned that an employee had accused him of improper hugging.  Calderon denied the allegation.[2]

A few days later, on March 23, 2012, Ledbetter wrote Calderon a letter banning him from the facility.  The letter stated that Southern Bakeries had received another employee complaint concerning inappropriate conduct by Calderon and, in response to the complaint, Southern Bakeries sought to prohibit Calderon from accessing its property until an investigation had been completed.  Southern Bakeries later reinstated Calderon's access rights as part of an informal

---

[2]Southern Bakeries did not adduce testimony from the employee who made the accusation.

Board settlement agreement. Thereafter, on May 23, 2012, an employee filed a second decertification petition with the Board. A decertification election was scheduled for February 7, 2013.

On January 8, 2013, Calderon met with Ledbetter and other Southern Bakeries management employees at the plant. They discussed the installation of surveillance cameras in the break area. The cameras had been installed without notice or bargaining with the Union. Ledbetter explained that the cameras were installed to deter theft. Specifically, employees had complained about a stolen cell phone and stolen lunches. In response to the Union's complaints, Ledbetter offered to cover the cameras whenever the Union visited.

On January 16, 2013, Ledbetter sent the Union a letter stating that Southern Bakeries had reason to believe that the Union had been visiting the facility to campaign and solicit support for the decertification election, which he thought were inconsistent with the Collective Bargaining Agreement. Ledbetter reiterated the policy for Union visits to the facility. Specifically, Ledbetter stated that the Union could not access the premises without first informing Southern Bakeries of the issue it sought to investigate and the specific employees it planned to meet. Thereafter, when the Union requested access to the facility, Southern Bakeries frequently denied access because the Union's request did not comply with the policy.

On January 17, 2013, Southern Bakeries posted a memorandum for employees. Southern Bakeries labeled the memorandum: "Answers to Employee Questions Dated January 16, 2013." The memorandum contained the following statements:

> The [U]nion appears to have plans to take our employees out on strike here in Hope, same as they did recently at Hostess, where over 18,000 jobs were lost and 33 bakeries and 500 retail outlets were closed. Perhaps that is why the International (Maryland) BCTGM representatives have come to Hope.

> The [U]nion['s] statement that [Southern Bakeries] is 'gonna fire
> [H]ispanics (Latino employees) if they change their names simply
> makes us sad and is entirely false.

Also, in January and in February 2013, Ledbetter held a series of meetings with the employees where he delivered speeches concerning the Union.  Specifically, on January 23, 2013, Ledbetter delivered a "kick-off" speech and a "collective-bargaining" talk.  About 170 employees attended the January 23, 2013 speech.  On February 1, 2013, Ledbettter made another speech on "collective-bargaining" and a presentation on "strikes" and "job security." Approximately 170 employees attended the February 1, 2013 speech.  On February 5, 2013, Ledbetter made a "final speech" about the upcoming decertification election, and about 150 employees attended this speech.  Ledbetter's speeches included the following comments:

> It is our understanding that the [U]nion has stated that it plans to
> deal with Southern Bakeries in that same way as Hostess with a
> strike and/or boycotts, by trying to get customers to stop buying
> our products if we don't agree to union demands.  If that is the
> case, this is of great concern because, as you know, the [Union]
> strike closed Hostess. [Thirty-three] bakeries and 500 outlet stores
> distribution centers have been closed and are up for sale. Over
> 18,000 people are without jobs.
>
> Just remember what happened to Meyer's Bakeries. They had a
> union contract and went bankrupt and out of business.
>
> If any of you are harassed or threatened on any basis during
> this election campaign, regardless of whether you are for or
> against the [U]nion, we want to know about it immediately
> so we can address the problem, just as we always have. We
> will not tolerate the abuse of any employee rights in this
> work place. But to remedy the problem and prevent
> recurrence, you must bring it to our attention.
>
> [J]ob security is really the basic issue you will be voting on in this
> election. You must make a very important decision. That is why
> we have spent so much time getting the facts to you.
>
> [The Union] appear[s] ready again to put your jobs at risk if they
> continue to represent you after the [e]lection.  Specifically, we are

> hearing . . . that the [U]nion is planning to repeat boycotts of our customers.
>
> The [U]nion . . . can show you only a history of plant closings, boycotts, strikes, union dues and broken promises.
>
> [A]ll the [U]nion can do is ask and all the [U]nion can get is what [Southern Bakeries] will agree to give.
>
> [Unions] can promise employees the moon.
>
> [T]he NLRB assumes that employees understand that the [U]nion has no power to make its promises come true.
>
> Why is it that collective bargaining can, and did, result in your getting less pay than non-union employees?
>
> [All] of our costs related to dealing with this [U]nion leave less money for wages and benefits.
>
> As our bottom line is thin anyway, the money that is spent on bargaining and grievances and otherwise dealing with the [U]nion is money that is simply not otherwise available to our employees.
>
> [W]e have incurred tens of thousands of dollars in legal fees that have left us with less money to put into the pockets of our unionized employees than we have been able to give to our non-union workforce.
>
> You're voting on whether you want to pay this [U]nion to put all your wages, benefits and working conditions on the bargaining table again and risk them in a game of high stakes poker—a game with only one sure winner—the [U]nion.

Following Ledbetter's speeches, the Union filed several blocking charges, and the Board postponed the decertification election pending an investigation by the Board.

Between May 31, 2013, and June 12, 2013, hourly production employee, John Hankins ("Hankins"), circulated a withdraw petition amongst employees, and on June 13, 2013, he met with Ledbetter and provided him with the completed petition. The petition stated: "We hereby request that our employer immediately withdraw recognition from the . . . [U]nion, as it does not

enjoy the support of a majority of employees in the bargaining unit." The petition possessed 132 signatures of employees. At that time, the bargaining unit consisted of approximately 199 employees. Thus, the 132 signatures represented a majority of the bargaining unit.

Upon receiving the petition and verifying the signatures, on July 3, 2013, Ledbetter sent a letter to the Union notifying it of the withdrawal petition. Southern Bakeries then denied the Union access to the facility and ceased dues check-offs. On July 22, 2013, the Union rejected the withdrawal petition and requested plant access. Southern Bakeries denied its request.

Thereafter, the Board implemented a field investigation and determined that there was reasonable cause to believe that Southern Bakeries had violated the National Labor Relations Act ("the Act"). Following the field investigation, on August 20, 2013, McKinney filed a complaint against Southern Bakeries with the Board. On February 4-7, 2014, a hearing was held before an administrative law judge ("ALJ") on the unfair labor charges. On February 28, 2014, McKinney filed the instant 10(j) petition seeking temporary injunctive relief pending the final disposition of the matter before the Board.

On July 17, 2014, the ALJ issued his decision. The ALJ found that Southern Bakeries interfered with, restrained, and coerced employees in the exercise of their rights under the Act. Specifically, the ALJ found that Southern Bakeries committed a series of unfair labor practices and those unfair labor practices tainted the employees' June 2013 withdrawal petition.[3]

---

[3]McKinney filed a Motion to Supplement the Record with the ALJ's Decision. (ECF No. 36). In response, Southern Bakeries filed a Motion to Supplement the Record With Its Exceptions to the ALJ's Decision. (ECF No. 38). Specifically, in its motion, Southern Bakeries does not object to the supplementation of the decision to the record. However, Southern Bakeries seeks leave to file a supplement listing exceptions to the ALJ's decision so that it can inform the Court of the decision's "legal deficiencies." The Board's Rules and Regulations grant Southern Bakeries the right to file exceptions to the *Board* when it is deciding whether to adopt the ALJ's decision, but they do not create the same right to file exceptions to the *Court*. CFR §102.46. Accordingly, the Court finds that McKinney's Motion to Supplement should be and hereby is **GRANTED** (ECF No. 36), and Southern Bakeries's Motion to Supplement With Its Exceptions should be and hereby is **DENIED** (ECF No. 38).

<u>DISCUSSION</u>

Section 10(j) allows the Board to petition a district court for a temporary injunctive relief pending the resolution of an underlying case.   29 U.S.C. 160(j).   In considering a request for a preliminary injunction under Section 10(j), the Eighth Circuit has held that a court must consider the factors for preliminary relief set forth in *Dataphase.  Sharp v. Parents in Comm. Action, Inc.*, 172 F.3d 1034, 1037-38 (8th Cir. 1999).   The *Dataphase* factors are:  (1) the probability that movant will succeed on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between the harm to the movant and the harm to other parties if the injunction is granted; and (4) the public interest.  *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981). The Court will address each of these factors separately.

<u>1. Probability of Success on the Merits</u>

The Court will first address the probability that McKinney will succeed on the merits. "In a typical preliminary injunction, a petitioner need not prove a greater than fifty-percent likelihood of success."  *Osthus v. Laborers Dist. Council*, 742 F. Supp. 2d 1042, 1049 (D. Minn. 2010) (citing *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991)). For injunctions pursuant to the Act, the Eighth Circuit has applied a less stringent standard.  *Id.* (citing *Dawidoff v. Over-the-Road, City Transfer, Cold Storage, Grocery & Mkt. Drivers & Helpers, Inside Employees, Local Union No. 544*, 736 F.2d 465, 466-67 (8th Cir. 1984)).

Further, in addressing this factor, the Court must not second guess the Board's decision to commence enforcement proceedings.  *Sharp*, 172 F.3d at 1039.  Rather, the likelihood of success is relevant to the issuance of a preliminary injunction "because the need for the court to act is, at least, in part, a function of the validity of the applicant's claim."  *Id.* (internal quotation omitted).

Courts are also "hospitable" to the Board's view of the law given its expertise in matters of labor relations. *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 502 (7th Cir. 2008).

In cases where an ALJ has issued a decision, like the instant case, courts give deference to the view of the ALJ. *Id.* at 502 n.4. Specifically, the Seventh Circuit has noted that evaluating the likelihood of success calls for a predictive judgment about how the Board is likely to rule and that the ALJ is the Board's first-level decisionmaker. *Id.* Thus, having presided over the hearing, the Seventh Circuit uses the ALJ's factual and legal determinations as a useful benchmark against which the Director's prospects of success may be weighed. *Id.*

In this case, McKinney asserts that she is likely to establish that Southern Bakeries committed unfair labor practices in violation of Section 8(a)(1) and Section 8(a)(5) of the Act.[4] The Court will first address the alleged Section 8(a)(1) violations. Then, the Court will discuss the alleged Section 8(a)(5) violations.

## A. Section (8)(a)(1)

Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of rights under Section 7 of the Act. 29 U.S.C. § 158. Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations" and "to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157. In this case, McKinney asserts that Southern Bakeries violated Section 8(a)(1) by: (i) interrogating employees and making a threat of unspecified reprisals; (ii) making threats

---

[4]In her Complaint before the ALJ, McKinney also asserted that Southern Bakeries violated Section 8(a)(3) when it: (1) placed three union employees under investigations and (2) fired another employee, Christopher Contreras. However, in her 10(j) petition and supporting briefs, McKinney does not raise any arguments concerning the three employees who were placed under investigations. Further, as to Christopher Contreras, the ALJ determined that Southern Bakeries lawfully discharged him, and McKinney informs the Court that, because of the ALJ's ruling, she no longer seeks injunctive relief as to Contreras. Accordingly, the Court will not consider the Section 8(a)(3) violations.

of job loss and plant closures; (iii) portraying collective bargaining and unionizing as futile; (iv)

promising benefits for voting against the Union; (v) disparaging the Union; and (vi) creating an

impression of surveillance.  The Court will address these alleged violations separately.

*i. Interrogations and Threat of Unspecified Reprisals*

McKinney contends that Southern Bakeries unlawfully interrogated employees and

threatened employees with unspecified reprisals when Ledbetter made the following statement:

> If any of you are harassed or threatened on any basis during
> this election campaign, regardless of whether you are for or
> against the [U]nion, we want to know about it immediately
> so we can address the problem, just as we always have. We
> will not tolerate the abuse of any employee rights in this
> work place. But to remedy the problem and prevent
> recurrence, you must bring it to our attention.

Southern Bakeries asserts the statement was lawful and was aimed at preventing harassment

against all employees.  To further validate Ledbetter's statement, Southern Bakeries claims that

it was made in response to employees' complaints about annoying solicitations by union

representatives.

The ALJ concluded that Ledbetter's statement was an interrogation because it amounted

to mass questioning about union activities by the highest-ranking plant official.  The ALJ also

concluded that Ledbetter's comment "we want to know about it immediately so we can address

the problem" constituted a threat of unspecified reprisal because he asked employees to report

instances of lawful union activity and suggested those employees who were reported would be

disciplined.[5]

The Board has held the totality of the circumstances must be considered when

determining whether the questioning of employees constitutes an unlawful interrogation.

---

[5] The ALJ also found that Southern Bakeries interrogated an employee when a supervisor asked him "why he became a dues paying member."  However, McKinney did not brief the Court on this alleged unfair labor practice. Accordingly, the Court will not address it.

10

*Westwood Healthcare Center,* 330 NLRB 935, 939 (2000).  Additionally, the Board has held it is appropriate to consider the following factors: (1) the background; (2) the nature of the information sought; (3) the identity of the questioner; (4) place and method of interrogation; and (5) truthfulness of the reply.  *Id.*  In applying these factors, a court should further consider whether "the questioning at issue would reasonably tend to coerce the employee at whom it is directed."  *Id.* at 940.  Further, the Act allows employees to engage in persistent union solicitation even when it annoys or disturbs the employees who are being solicited.  *Ryder Truck Rental*, 341 NLRB 761, 761 (2004).  Accordingly, "an employer's invitation to employees to report instances of 'harassment' by employees engaged in union activity is violative of Section 8(a)(1)."  *Id.*

Here, the Court concludes that the Board could find that Ledbetter's statement constituted an interrogation and a threat of unspecified reprisal.  The statement was made by Southern Bakeries's Executive Vice President and General Manager at a formal speech during a decertification campaign.  Further, the statement was made in conjunction with numerous comments conveying Southern Bakeries' distaste for the Union.  Thus, employees could reasonably assume Ledbetter targeted reports of union activity.  Further, even if Ledbetter implemented the rule to prevent annoyances by union representatives, persistent union solicitation is lawful even if it disturbs employees.  Southern Bakeries cannot invite employees to report harassment by employees engaged in lawfully union activity.  *See id.*  Therefore, the Court finds that McKinney has established a likelihood of success on the merits with respect to this unfair labor practice.

*ii.  Threats of Job Loss and Plant Closure*

McKinney asserts that Southern Bakeries repeatedly made threats of job loss and plant closure during Ledbetter's speeches and in the posted memorandum.  Southern Bakeries denies that it threatened employees and asserts it only expressed its opinion regarding the Union's strike plans.

In evaluating an alleged threat, the Board does not "consider subjective reactions, but rather whether, under all the circumstances, a respondent's remarks reasonably tended to restrain, coerce, or interfere with employees' rights guaranteed under the Act." *Dining Service*, 312 NLRB 845, 846 (1993).  An employer may lawfully predict a plant closure if the employer can show that a plant closure is the probable consequence of unionization for reasons beyond the employer's control.  *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969).  However, the statements must be "carefully phrased on the basis of objective fact." *Id.*  The Board has held that unsupported employer predictions that a plant shutdown will follow a union victory are unlawfully coercive.  *Federated Logistics and Operations*, 340 NLRB 255, 256 (2003).  The ALJ concluded that Ledbetter's comments in the January 2013 and February 2013 speeches threatened employees with job loss and a plant closure.  The ALJ found Ledbetter's statements comparing Southern Bakeries to Hostess particularly coercive and intimidating.[6]

The Court concludes that the Board could find that Southern Bakeries unlawfully threatened employees with job loss and plant closures.  Southern Bakeries repeatedly told employees that union representation could lead to a plant closure and job losses and repeatedly informed employees of the statistics from the Hostess strike.  Specifically, Southern Bakeries noted the Hostess strike statistics in Ledbetter's January 23, 2013 and February 1, 2013 speeches

---

[6] The ALJ also found that Southern Bakeries threatened an employee when a supervisor told him that the supervisor had the "upper hand" and could get rid of him whenever he desired. However, McKinney did not brief the Court on this alleged unfair labor practice.  Accordingly, the Court will not address it.

and in the memorandum posted on January 17, 2013.  Furthermore, in Ledbetter's speeches, he made comments such as "job security is really the basic issue you will be voting on in this election."   In considering these statements, the Court finds that Ledbetter's remarks could reasonably tend to restrain, coerce, or interfere with employees' rights guaranteed under the Act. Accordingly, the Court finds that McKinney has established a likelihood of success on the merits with respect to this unfair labor practice.

### *iii.  Futility of Bargaining and Unionizing*

McKinney asserts that Ledbetter's speeches repeatedly portrayed collective bargaining and unionization as futile.  Southern Bakeries asserts that Ledbetter merely expressed general views about collective bargaining.  The ALJ concluded that the following statements unlawfully conveyed that ongoing unionization was futile: "the [U]nion has no power to make its promises come true"; "all the [U]nion can do is ask and the all union can get is what [Southern Bakeries] will agree to give"; "[Unions] can promise employees the moon."

"Under well-established precedent, statements by employer representatives that bargaining will start from ground zero or that parties will bargain from scratch violate Section 8(a)(1) if, in context, they reasonably could be understood by employees as threats of loss of existing benefits and leave employees with the impression that what they may ultimately receive depends upon what the union can induce the employer to restore."  *Earthgrains Co.*, 336 NLRB 1119, 1119-20 (2001) (internal quotations omitted).  In this case, the Court finds that Ledbetter's repeated statements about the ineffectiveness of collective bargaining could reasonably be understood by employees as threats that benefits would be lost and union representation would be futile.  Accordingly, the Court finds that McKinney has established a likelihood of success on the merits with respect to this unfair labor practice.

### iv.  Promising Benefits

McKinney asserts that Southern Bakeries violated Section 8(a)(1) when it suggested that employees would receive a raise if they voted against the Union.  Southern Bakeries claims that it merely informed employees that its nonunion employees receive a higher percentage pay increase compared to unionized employees.

An employer violates Section 8(a)(1) when it makes an express or implied promise of benefits as an inducement to vote against the union.  *Presbyterian/St. Luke's Med. Ctr. v. NLRB*, 723 F.2d 1468, 1475 (10th Cir. 1983).  Such conduct is viewed as coercive because it lulls employees into believing that they can obtain benefits promised by the union without the union's aid.  *Id.*  The ALJ determined that Southern Bakeries implied that employees would receive a raise if they ousted the Union when Ledbetter made the following statements in his speeches: "[a]ll of our costs related to dealing with this [U]nion leave less money for wages and benefits"; "[w]hy is it that collective bargaining can, and did, result in you getting less pay then non-union employees?"; "[m]oney . . . spent on bargaining and grievances and otherwise dealing with the [U]nion is money that is simply not otherwise available to our employees"; and "[w]e have incurred tens of thousands of dollars in legal fees that have left us with less money to put into the pockets of our unionized employees than we have been able to give to our non-union workforce."  The Court also finds that these statements imply that an employer victory in the decertification election would result in employees receiving higher wages.  Accordingly, the Court finds that McKinney has established a likelihood of success on the merits with respect to this unfair labor practice.

*v. Disparagement of the Union*

McKinney contends that Southern Bakeries disparaged the Union in Ledbetter's speeches and in the posted memorandum.  Southern Bakeries denies that it disparaged the Union and asserts that it lawfully expressed its opinions on unionism.  The ALJ concluded that Southern Bakeries disparaged the Union in the memorandum because it repeatedly labeled the Union's alleged campaign statements as fraudulent while threatening plant closure.

"Words of disparagement alone concerning a union or its officials are insufficient for finding a violation of Section 8(a)(1)."  *Sears, Roebuck & Co.*, 305 NLRB 193, 193 (1991).  However, an employer violates Section 8(a)(1) when it repeatedly disparages the union and the disparaging statements are made in conjunction with coercive threats.  *Tony Silva Painting, Co.*, 322 NLRB 989, 993 n.5 (1997).

The Court also concludes that the Board could find that Southern Bakeries disparaged the Union.  Southern Bakeries repeatedly accused the Union of making false and misleading statements in Ledbetter's speeches and in the memorandum and made these accusations in connection with threats of plant foreclosure.  Accordingly, the Court finds that McKinney has established a likelihood of success on the merits with respect to this unfair labor practice.[7]

*vi. Impression of Surveillance*

McKinney asserts that Southern Bakeries created an unlawful impression of surveillance when it installed cameras in the break room.  Southern Bakeries asserts that the cameras were installed to deter theft and could not be used for surveillance because it covered the cameras during union meetings.  The ALJ concluded that the installation of the cameras could reasonably

---

[7]The ALJ also determined that Southern Bakeries disparaged the Union when it attributed the following statement to the Union: "The [U]nion['s] statement that [Southern Bakeries] is 'gonna fire [H]ispanics (Latino employees) if they change their names simply makes us sad and is entirely false."  However, in the instant proceedings, McKinney did not brief the Court on this issue. Accordingly, the Court will not consider it.

cause employees to assume that their union activities were monitored by Southern Bakeries because the cameras were installed in the break room during a decertification campaign and the break room served as the hub for union gatherings.

"Creating an impression that a company keeps its employees' union activities under surveillance violates Section 8(a)(1) because it could inhibit the employees' right to pursue union activities untrammeled by fear of possible employer retaliation." *NLRB v. Chem Fab Corp.*, 691 F.2d 1252, 1258 (8th Cir. 1982). The Board has held that the installation of cameras creates an impression of surveillance and violates Section 8(a)(1) when the cameras would reasonably lead employees to believe that their union activities were being kept under surveillance. *Jewish Home for the Elderly of Fairfield Cnty.*, 343 NLRB 1069, 1082 (2004). In this case, even though Southern Bakeries covered the cameras during union meetings, employees could reasonably assume they were installed to monitor union activities because the cameras were installed during a decertification campaign and in the room where the Union conducted its meetings. Accordingly, the Court finds that there is sufficient evidence to establish a likelihood of success on the merits with respect to this unfair labor practice.[8]

## B.   Section (8)(a)(5)

Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158. McKinney asserts that Southern Bakeries violated Section 8(a)(5) when it: (i) installed cameras in the break room

---

[8]In her petition before the ALJ and the petition before the Court, McKinney also claimed that Southern Bakeries engaged in surveillance of employees at the January 23 and February 1, 2013 meetings. The ALJ dismissed the allegation because McKinney failed to adduce evidence, brief the matter, or explain her theory. McKinney similarly failed to adduce evidence, brief the matter, or explain her theory in her 10(j) petition before this Court. Accordingly, the Court will not consider this allegation.

without giving notice to the Union; (ii) restricted the Union's property access; and (iii) unlawfully withdrew recognition of the Union.[9]

### i. Surveillance Cameras

McKinney asserts that Southern Bakeries violated Section 8(a)(5) when it installed cameras in the break room without first bargaining with the Union. The ALJ agreed with McKinney. The Board has held that the installation of surveillance without giving the Union an opportunity to bargaining over its usage violates Section 8(a)(5). *Nortech*, 336 NLRB 554, 568 (2001). In this case, it is undisputed that Southern Bakeries installed the cameras in the break room without bargaining. Accordingly, the Court finds that McKinney has established a likelihood of success on the merits with respect to this unfair labor practice.

### ii. Union Access

McKinney asserts that Southern Bakeries violated Section 8(a)(5) when Ledbetter altered the Union's access to the facility. Specifically, McKinney contends that, in the past, Southern Bakeries gave the Union unfettered access to the facility. However, McKinney asserts that during the decertification campaign, Southern Bakeries restricted its access. Southern Bakeries claims it only denied the Union access to its facility for the impermissible purposes set forth in the parties' collective bargaining agreement. The ALJ concluded that Southern Bakeries violated Section 8(a)(5) because it changed the Union's access rights to the facility without bargaining.

An employer's changes to past property access practices without bargaining has been found to violate Section 8(a)(5). *Ernst Home Ctrs., Inc.*, 308 NLRB 848, 848-49 (1992).

---

[9]In her complaint, McKinney additionally asserted that Southern Bakeries unlawfully refused to deduct and remit dues to the Union since July 2013. However, the ALJ concluded that Southern Bakeries' cessation of dues deductions and remissions was valid, and McKinney informs the Court she no longer wishes to pursue injunctive relief as to that allegation.

Specifically, where an employer has a past practice of providing union representatives access to its facilities, that past practice becomes a term and condition of employment that cannot be changed without first notifying and bargaining with the Union. *Id.* at 865.

In this case, Calderon testified that Southern Bakeries had once allowed the Union to visit the facility without any inquiry as to the specific purpose for the visit and gave full access to the break room. Ledbetter also testified that the Union and Southern Bakeries had established a "level of trust" with the Union regarding its access to the facility prior to the decertification campaign. However, during the decertification campaign, Calderon testified that Ledbetter implemented a new policy requiring the Union to state the motive for the visit and to identify the employees it sought to meet. Calderon further testified that Southern Bakeries required the Union to meet in a small cubicle rather than having unlimited access to the break room.[10] The Court finds that this testimony sufficient evidence to establish a change in the past practice of property access without bargaining. Accordingly, the Court concludes that McKinney has established a likelihood of success on the merits with respect to this claim. [11]

### iii. Withdrawal Recognition

McKinney asserts that Southern Bakeries unlawfully withdrew recognition from the Union because Southern Bakeries tainted the withdrawal petition with violations of Section (8)(a)(1) and Section 8(a)(5). Southern Bakeries argues that the *Master Slack* factors do not weigh in favor of a causal connection.

---

[10] The ALJ credited Calderon's testimony concerning the Union's access to the facility over Ledbetter's testimony. The ALJ reported that Calderon appeared straightforward and candid while Ledbetter was argumentative and parsed his words when answering tougher questions.

[11] The ALJ also concluded that Southern Bakeries altered the Union's property access when it replaced a window in the break room that the Union used to communicate with employees with a piece of plywood. However, McKinney failed to brief the Court on this matter. Accordingly, the Court will not consider the installation of the plywood as an change in the Union's property access.

18

"An employer may not . . . lawfully withdraw recognition from a union where it has committed unfair labor practices that have a tendency to cause the loss of union support." *Ardsley Bus Corp.*, 357 NLRB No. 85, *4 (2011). Where the unfair labor practices do not involve a general refusal to recognize and bargain with the union, there must be a causal relationship between the unfair labor practices and the loss of support in order for the withdrawal of recognition to be unlawful. *Id.* To determine whether there is a causal connection between an employer's unfair labor practices and employees' disaffection, the Board considers the following factors:

> (1) the length of time between the unfair labor practices and the withdrawal of recognition; (2) the nature of the illegal acts, including the possibility of their detrimental or lasting effect on employees; (3) any possible tendency to cause employee disaffection from the union; and (4) the effect of the unlawful conduct on employee morale, organizational activities, and membership in the union.

*Master Slack Corp.,* 271 NLRB 78 (1984).

The Court has already concluded that McKinney has established a likelihood of success on the merits with regard to several unfair labor practices. Thus, the Court need only consider whether McKinney is likely to establish a causal connection between the alleged unfair labor practices and the employees' withdrawal petition. The ALJ determined that a causal connection existed between the practices and the petition. Specifically, the ALJ determined that Southern Bakeries committed "extensive and repeated violations . . . close in time to [the decertification] petition" that were "so voluminous and egregious that they naturally spawned significant disaffection from a Union that had been rendered powerless by a recalcitrant employer."

In the instant proceedings, the Court finds that McKinney has offered evidence of a causal connection. As to the first two *Master Slack* factors, McKinney has offered evidence that

Southern Bakeries committed numerous unfair labor practices, which included threats of job losses and plants closures, from March 2012 through February 2013. And, five months later, in June 2013, employees presented Ledbetter with a withdrawal petition.

As to the remaining two *Master Slack* factors, the disparaging comments, threats, and coercive statements could have caused the employees disaffection for the Union. Further, Southern Bakeries's restriction on the Union's property access could have affected organizational activities and membership in the Union. Accordingly, in light of these factors, the Court finds that there is sufficient evidence to establish a likelihood of success on the merits with respect to an unlawful withdraw of recognition.[12]

## 2. Threat of Irreparable Harm

The Board must also show "the case presents one of those rare situations in which the delay inherent in completing the adjudicatory process will frustrate the Board's ability to remedy the alleged unfair labor practices." *Sharp*, 172 F.3d at 1039. The irreparable harm to be demonstrated is not harm to individual employees. *Id.* at 1038. The Board must show "harm to the collective bargaining process or other protected employee activities if a remedy must await the Board's full adjudicatory process." *Id.*

McKinney contends a threat of irreparable harm exists because Southern Bakeries has illegally withdrawn recognition of the Union and, absent an interim bargaining order, there will be no collective bargaining. The Court agrees. McKinney has established a likelihood of success on the merits regarding an unlawful withdrawal of union recognition. Interim injunctive relief is necessary because it could be months before the Board issues it final decision and the

---

[12]The ALJ also concluded that because Southern Bakeries unlawfully withdrew recognition from the Union, its subsequent wage increase and ban on the Union's property access was unlawful. However, McKinney did not brief the Court on this allegation. Therefore, the Court will not address it.

longer Southern Bakeries refuses to recognize the Union, the harder it will be for the Union to regain support if the Board finds Southern Bakeries's conduct was unlawful.

Southern Bakeries asserts that McKinney's delay in filing the petition "calls [her] claim of irreparable harm into serious question."  Specifically, Southern Bakeries claims that the petition was delayed because it withdrew recognition of the Union on July 3, 2013, but McKinney did not file her petition until February 28, 2014.  McKinney asserts that the Board used the time between July 3, 2013, and February 28, 2014, to investigate, deliberate, and authorize the filing of the petition.

While a Court may take into consideration the timeliness of the petition, it is not required to do so.  *Hubbel v. Patrish LLC*, 903 F. Supp. 2d 813, 818 (E.D. Mo.).  Further, courts generally find that the Director's delay in commencing a 10(j) action does not undermine the case for injunctive relief.  *Paulsen v. Renaissance Equity Holdings, LLC*, 849 F. Supp. 2d 335, 361 (E.D. N.Y. 2012).  According to the Second Circuit, the Board "does not take lightly the commencement of a 10(j) action," and it is acceptable for months to pass between the alleged unfair labor practices and the Regional Director's decision to commence a 10(j) action.  *Kaynard v. MMIC, Inc.*, 734 F.2d 950, 954 (2d Cir. 1984).  Specifically, a fourteen-month delay has been considered typical in 10(j) proceedings.  *Paulsen*, 849 F. Supp. 2d at 361.  Here, the Board waited a little over eight months to file the petition.  Accordingly, the Court finds that the McKinney's delay in filing the petition does not call McKinney's claim of irreparable harm into question.  Therefore, this factor weighs in favor of an injunction.

### 3.  Balance of Harms

The Court must next balance the potential for harm to the moving party against any potential harm to the nonmoving party in the event an injunction issues.  *Dataphase*, 640 F.2d at 114.  Southern Bakeries claims the injunction would harm its employee because it would undermine their free choice to divest the Union.  The Court disagrees with Southern Bakeries.  Given the likelihood that Southern Bakeries committed several unfair labor practices, employees' loss of support can be attributed to those violations, not to their free choice.  Further, the Court notes that an interim bargaining order would not compel Southern Bakeries to agree to any term or condition by the Union.  The order would only require Southern Bakeries to bargain with the Union in good faith to an agreement or impasse.  Accordingly, the Court finds that this factor weighs in favor of the issuance of an injunction.

### 4.  Public Interest

Under the final prong, the Court must consider the public interest.  *Dataphase*, 640 F.2d at 114.  Southern Bakeries claims that the public interest is in protecting the will of the employees to withdraw support from the Union.  Again, given the likelihood that Southern Bakeries committed numerous unfair labor practices, the Court cannot conclude that it was the employees' will to disavow the Union.  Further, the Court notes that Congress "elucidated a strong public interest [in collective bargaining] when it enacted the Act in an effort to protect employees' rights to organize."  *Chester v. Eichorn Motors, Inc.*, 504 F. Supp. 2d 621, 630 (D. Minn. 2007).  Thus, the public interest favors granting the temporary relief.

<u>CONCLUSION</u>

Accordingly, because the *Dataphase* factors weigh in favor of the issuance of interim relief, the Court finds that McKinney's Petition for an Injunction Pursuant to Section 10(j) of the Act (ECF No. 1) should be and hereby is **GRANTED**.  An order of even date consistent with this Opinion shall issue.

**IT IS SO ORDERED**,  this 14th day of August, 2014.

<u>/s/ Susan O. Hickey</u>
Susan O. Hickey
United States District Judge